John HATTENSTY, Plaintiff In Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–13112.

Court of Criminal Appeals of Oklahoma.

Feb. 21, 1962.

Wilson Wallace, Ardmore, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., James D. Payne, County Atty., Burke G. Mordy, Asst. County Atty., Carter County, Ardmore, for defendant in error.

NIX, Presiding Judge.

John Hattensty, who shall hereinafter be referred to as the defendant, was charged by information in the district court of Carter County with the crime of murder. He was tried before a jury who found the defendant guilty of manslaughter in first degree and set his punishment at four years in the state penitentiary.

It is revealed by the transcript of testimony that on April 27, 1959, Deputy Sheriff John Smithers in answer to a call, appeared at the home of the defendant, John Hattensty, in Carter County. Upon entering the premises found the dead body of Sherman Ward lying on the living room floor, a gun shot wound being obvious in the right side of the deceased. Defendant was in the kitchen eating pork chops and bread. Upon inquiry being made by Deputy Smithers the following testimony ensued:

"A. Yeah, I had a call from the jail that there had been a shooting at John Hattensty's home. Well, I knew where his home was so—not too far from my house, so I rushed over, knocked on the door, and hollered 'Hello', and no one answered me. And I tried the screen door, and it was open, and I just open-

ed it and stepped on the inside and there was a man laying in the floor, head pointing in a southeasterly direction. And I called out for John, and I said, 'John, where are you at?' And he said 'In here'. And so I walked on down to where I could see in the little kitchen, and he was standing there eating a piece of pork chop and bread, and I said 'what happened to this man here on the floor?'

"MR. WALLACE: Just a minute. I object to any statement made by defendant, as incompetent and immaterial—"

"BY THE WITNESS:

"A. He said 'I shot the S.B.'

"BY MR. MORDY

"Q. The S—

"A. S.B. Son of a bitch, in other words, that's the way he put it. He said—

"Q. He actually said that?

"A. Yes."

Smithers further testified that when they removed the body they found a small knife underneath said body, also defendant was drunk at the time the officer arrived.

Defendant based his justification upon the theory of self-defense in that the deceased had made threats theretofore after a controversy between the two some days before the slaying. The argument arose over the wife of the deceased. On that occasion deceased had drawn a knife on defendant and was knocked down and evicted by the proprietor of the place of business. On the day in question defendant and two companions picked up the deceased on the highway with intention of driving him home. However, they stopped at the home of the defendant and after some drinking took place defendant stated he started to cook some biscuits. He claimed that the deceased was bothering him and he asked deceased to go in the front room and sit down. According to the defendant deceased assumed the improper attitude and answered as the following testimony reflects:

" * * * 'What are you trying to do, run me off?' And I looked around over there where he was. And I said, 'No, Sherman, I'm not—we're not—I'm not trying to run you off'. And I looked around there and he had a little knife in his hand, had it open.

"Q. Open?

"A. When I seen it. 'No, I'm not trying to run you off, I just merely asked you would you go in the front room and sit down.' And I—he come a walking—just walking over towards me—

"Q. What did he say to you now, as he walked towards you?

"A. He didn't say nothing. He just say 'You goin' to try to run me off.' And I walked out the kitchen door and walked in there. I said 'If you really want to go home, Sherm, I'll take you.' He said 'I'm not going no place.' He said 'I'm going to get you and Jeff both, before it's over with'. I said 'Maybe you will and maybe you won't.' He said 'I'll cut your throat.' He pulled his knife back and that's when I run.

"Q. Where did you run to?

"A. I run in there to the northwest bedroom in the clothes closet, and I got that four hundred ten and come back and met him right there at the door. * * *

* * * * * *

"Q. All right. Now, what did you do? What did he do?

"A. I said, 'Sherman, you better go home or go someplace.' I said, 'I don't want you chasing around all over the house with a knife.' And he just looked at me and looked at the gun, looked at me and started to grab the gun. Of course, I was scared and didn't know what to do. I just pulled the trigger."

Defendant's case was supported in part by the testimony of his companion Jimmie Johns who testified he saw deceased with the knife in his hand although he did not see

the altercation as he was in the other room. Testimony was admitted as to the bad reputation of deceased as having been in numerous altercations with a knife including the slashing of his wife five times.

Evidence of the homicide was sufficient to support the conviction. They refused to find defendant guilty of murder. However, they found defendant guilty of manslaughter in the first degree and assessed the minimum sentence.

Defendant argues but one assignment of error claiming that he was denied a fair and impartial trial as guaranteed by Art. 2, § 6 of the Oklahoma Constitution. His argument as to the denial of a trial free from prejudice was based entirely upon the action of the trial judge during the course of the trial.

█ Defendant charged that the trial judge entered into actual participation of the case and aided the county attorney to the extent that the jury was influenced in their thinking. The following argument was advanced by the defense counsel and set out in his brief:

"Throughout the trial of the case whenever counsel for defense would object or attempt to protect his client, the court would by gestures, by signs, by impatient shakes of the head, all of which cannot and are not shown in the record, clearly demonstrate to the jury that he was in disagreement with counsel for defense."

As an illustration defendant recites a portion of the record in support of his contention:

"Mr. Wallace: Now, what is this book that the Court is handing to the County Attorney?

"The Court: Record of the case is this—

"Mr. Mordy: Well, Your Honor, all I want is this particular statement right here. I don't want all this preliminary, may I just tape this up?

"Mr. Wallace: We object to the Court advising counsel how to proceed in this case—

"Mr. Mordy: I'm not asking to be advised, I just ask the Court if I could.

"The Court: Asking permission to physically remove that exhibit—?

"Mr. Mordy: Yes, Your Honor.

"The Court: Very well, permission is granted.

"Mr. Wallace: I want to make a record at this point in the case, Your Honor.

"The Court: I think you've already made quite a bit of record.

"Mr. Wallace: I'm going to make some more too, if Your Honor, please. I think I have the right in representing my client.

"The Court: Yes, you certainly do, but the Court would appreciate it if you would quit being so repetitious about it. Now, you have made your objection, the Court has ruled on it, and now, let's go ahead.

"Mr. Wallace: All right. Let the record show that we object to the remarks of the Court, which were made in the presence of the jury, as prejudicial to the rights of this defendant. And, we, also, at this time, the defendant wants to object to the apparent efforts on the part of the Court in this case to aid the prosecution in the trial of this case.

"The Court: You may continue to object, but you may proceed Mr. Mordy."

It is difficult for this Court to consider such an assignment of error. We were not present and were not able to hear the tone of voice, the gesture or facial expression in connection therewith. However, it is somewhat obvious from this and other excerpts from the record that an indignant atmosphere hovered about the trial judge and defense counsel. The presentation of such repertoire is always indulged in at the expense of the defendant. It is beneath the dignity of the trial judge to become involved in such bickering and detracts from the

decorum of his court. Trial judges should use every precaution to avoid being provoked into such indulgence. After all, the defendant is on trial, his liberty is at stake and he is entitled to a fair and impartial trial. Remarks by the trial judge may inadvertently influence the jury to the detriment of the defendant. The trial judge has great prestige in his court and his remarks are weighed heavily by members of the jury, therefore, he should refrain from any verbal engagement that would afford the opportunity for any member of the jury to be prejudiced thereby.

This Court in the case of McMahan v. State, 96 Okl.Cr. 176, 251 P.2d 204, said:

"The trial court should carefully refrain from making statements in presence of jury which might be calculated to create prejudice against accused or to show that court had fixed opinions as to his guilt, and thus, court should not, in presence of jury, reprimand counsel for accused, or accuse counsel [of] being in contempt of court." Also see Reed v. State, Okl. Cr.App., 335 P.2d 932.

The argument illustrated between defense counsel and the trial judge in the instant case evidently was sparked by the judge attempting to call the county attorney's attention to evidence revealed at the preliminary hearing by handing him a copy of the preliminary transcript.

This Court stated the trial court's duty in presiding over a trial with clarity in the Reed case, supra, in substance as follows:

"Basically, trial judge in trial of a criminal case is referee or umpire of a contest between two opposing sides in the case at bar. He has to decide points of law, rule on admissibility of evidence and maintain decorum, he is to instruct jury upon all material issues of law, swear an officer or officers to keep the jury, he is to supervise the proceedings, he should refrain with diligence in becoming prosecutor or defense counsel, he should never invade

province of jury, and he should not intimate his feelings in matter by action, innuendo or remarks."

Though the Court reiterates its firm belief in the above rule, a review of the present record does not indicate the remarks, though improper, were of a prejudicial nature. Defendant was found guilty of a lessor offense and given the minimum sentence.

Therefore, the judgment and sentence of the trial court is hereby affirmed.

BRETT and BUSSEY, JJ., concur.